*State of New York*
*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  June 11, 2015                    519003
_____

In the Matter of N. KK.,
    Alleged to be a Neglected
    Child.

CHENANGO COUNTY DEPARTMENT OF
    SOCIAL SERVICES,                         MEMORANDUM AND ORDER
                Respondent;

CARLA KK.,
                Appellant.
_____

Calendar Date:  April 24, 2015

Before:  Peters, P.J., Garry, Egan Jr. and Lynch, JJ.

_____

    Victor B. Carrascoso, Cooperstown, for appellant.

    Sarah Fitzpatrick, Chenango County Department of Social
Services, Norwich, for respondent.

    Steven G. Natoli, Norwich, attorney for the child.

_____

Garry, J.

    Appeal from an order of the Supreme Court (Dowd, J.),
entered December 12, 2013 in Chenango County, which, among other
things, granted petitioner's application, in a proceeding
pursuant to Family Ct Act article 10, to adjudicate respondent's
child to be neglected.


    Respondent is the mother of a child (born in 1997) who was
removed from her custody and placed in petitioner's care after an

altercation in December 2011.  Petitioner then commenced this proceeding seeking a determination that respondent had neglected the child.  Following fact-finding and dispositional hearings, Supreme Court adjudicated the child to be neglected and continued her placement in petitioner's custody.  Respondent appeals.

A child is deemed to be neglected if his or her "physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his [or her] parent or other person legally responsible for [the child's] care to exercise a minimum degree of care" (Family Ct Act § 1012 [f] [i]).  Whether a parent has exercised the requisite degree of care depends on whether he or she "acted as a reasonably prudent parent would have acted under the circumstances," an objective standard that is applied without regard to lifestyle choices or economic or social status (Matter of Christian Q., 32 AD3d 669, 670 [2006]; see Matter of Antonio NN., 28 AD3d 826, 826-827 [2006]).  Here, respondent contends that petitioner did not establish that the child was impaired or in imminent danger of impairment and, further, that the neglect adjudication infringed upon respondent's right to raise the child in the lifestyle and values of her choice.

As respondent contends, it is well established that the liberty interest of parents in raising and rearing their children is constitutionally protected (see Troxel v Granville, 530 US 57, 65 [2000]; Matter of Bentley XX. [Eric XX.], 121 AD3d 209, 213 [2014]).  It is, however, equally well established that this protection is not absolute, that the parent's rights must be balanced against the best interests of the child, and that the child's welfare is paramount (see Lehr v Robertson, 463 US 248, 257-258 [1983]; Alex LL. v Department of Social Servs. of Albany County, 60 AD3d 199, 210 [2009], lv denied 12 NY3d 710 [2009]).  Here, the child testified that the altercation that led to her removal began when respondent became angry about the way the child had performed a chore.  An argument escalated to respondent threatening the child with a machete.  The child picked up a knife to defend herself, but both parties then put down the weapons, and the child left the residence.  While the child was outdoors, respondent locked the residence and left in her vehicle with the keys.  The child was locked outside for about 45 minutes

before respondent returned with police officers. Respondent offered a different account of these events, but Supreme Court credited the child's testimony, and this Court defers to such assessments (see Matter of Josephine BB. [Rosetta BB.], 114 AD3d 1096, 1100 [2014]).

Elizabeth Wonka, a sergeant with the State Police, testified that respondent was angry and aggressive upon her arrival at the station following this altercation, claiming that the child had threatened her with a machete. Wonka accompanied respondent back to the residence and interviewed both parties. According to Wonka, the child was calm and stated that respondent had initiated the altercation and had threatened her with the machete. Wonka stated that respondent remained angry and verbally abusive; respondent blamed the child for the altercation and stated in the child's presence that she wanted her removed from the home and would sign away her parental rights. At the time of this occurrence, Wonka was familiar with respondent, as she had complained to police about the child on other occasions and had previously asked them to remove the child from the home. On one occasion, respondent had asked police to remove the child because she would not stop reading a book. Respondent had also made numerous claims that people in the community had harassed her or damaged her property. According to Wonka, police had investigated each complaint — at least 20 — but had never found any evidence that harassment or damage had occurred. Wonka stated that respondent was sometimes calm in her interactions with police, but at other times was "loud, angry, abusive [and] irrational," and that her agitation had escalated during the weeks just before the December 2011 incident. On one occasion, respondent had told police that if they did not stop the alleged harassment, respondent would "slash somebody and [police would] have to find body parts." Based upon this history and her observations of respondent's demeanor on the evening of the altercation, Wonka grew concerned that respondent was a danger to the child or to herself, and made an arrest pursuant to the Mental Hygiene Law. Respondent was transported to a psychiatric hospital for an evaluation and released later that night. The child was placed in foster care, where she has remained.

Petitioner's neglect allegations are premised upon this incident, and upon respondent's mental health issues and living situation. A psychiatrist testified that he conducted a court-ordered evaluation and diagnosed respondent with a delusional disorder of a persecutory type. According to the psychiatrist, although respondent is functional in other areas, the disorder causes her to believe that she is constantly being harassed by others and to perceive ordinary events — such as the failure of her car to start — as incidents of intentional sabotage or persecution. As an example, he testified that when respondent visited his office for the evaluation, she was reluctant to park her car where she could not see it because she believed that unnamed persons would vandalize it. In most cases, according to the psychiatrist, this condition is not responsive to treatment because, unless a sufferer recognizes the disorder and wants to be helped, efforts to provide therapy or other assistance are often treated as persecution and rejected. The psychiatrist did not evaluate respondent's parenting capacities and did not interview the child, but testified that, in general, this mental condition in a parent would have a profound negative effect on a child's mental and emotional condition. Other witnesses, such as Wonka and petitioner's caseworkers, confirmed that respondent frequently claimed that she was being harassed or persecuted. Respondent's testimony included multiple statements that petitioner and others were harassing her and that negative events in her life — such as the child's removal — were examples of persecution.

As for the living conditions, at the time of the child's removal, respondent and the child were living in a small, unfinished one-room structure that the two of them had constructed. Respondent testified that the structure had electricity supplied by solar panels and was heated with a propane heater, and that meals were cooked on a propane camp stove. There was no plumbing or running water; respondent stated that she refused to use the well on the property because she believed that her neighbors had intentionally contaminated it, and instead purchased water in plastic containers for cooking and washing. As for sanitation, the child testified that a bucket kept in the structure's single room served as a toilet. Respondent testified that waste was anaerobically processed in

outdoor containers, but the child stated that she and respondent buried it in holes dug outside.

Respondent refused to permit petitioner to inspect this structure for more than a year after the child's removal, despite court orders directing her to do so. A caseworker who eventually inspected the structure testified that it was covered with tarps that had to be lifted out of the way to open the structure's only door and that blocked the windows, except for one or two small openings for ventilation. The interior was dark, smelled of urine and feces, and was cluttered with, among other things, live chickens in plastic containers. The caseworker saw no water, toileting or washing facilities or stove; when asked about these items, respondent stated that she did not have to answer such questions. The caseworker noted several safety concerns, including difficulty in exiting the structure in an emergency because of the covered door and windows and the cluttered conditions. Respondent stated that conditions in the structure had changed since the child's removal, and that she no longer resided there and visited only to care for her animals. However, the caseworker described observing cooking supplies and personal items present at the site, undermining this testimony with the suggestion that respondent might still have been residing there. Respondent offered clearly conflicting testimony in the record regarding the residence, testifying on several occasions prior to the inspection that she and the child had lived in the structure for about a year, but after the inspection that they had never resided there.

The child testified that she believed that respondent was doing everything she could and was trying to improve their home, but also testified that she never brought friends to the residence because she was ashamed of it, and that – although the child was a highly successful student who planned to attend college – respondent did not support her attendance at school and had tried to prevent her from attending in the past. She further stated that there had been other altercations with respondent, before the December 2011 incident, in which she had feared that she would be injured. The child did not want to return to respondent's care because she was afraid that they would fight again, and that someone might be injured or arrested.

Considering this testimony and the record as a whole, we find
ample support for Supreme Court's neglect determination.  The
incident in which respondent threatened the child with a machete
and locked her outdoors for an extended period on a winter
evening, combined with respondent's prior altercations with the
child and requests to police to have her removed from the home,
ongoing mental health issues and unsubstantiated complaints of
harassment and persecution supported the court's finding that
respondent created an imminent threat to the child's physical,
mental and emotional well-being (see Matter of Daniel X. [Monica
X.], 114 AD3d 1059, 1060-1061 [2014]; Matter of Catherine K., 224
AD2d 880, 881 [1996]; compare Matter of Anthony TT. [Philip TT.],
80 AD3d 901, 902-903 [2011], lv denied 17 NY3d 704 [2011]).  As
for the residence, even assuming, as respondent contends, that
the conditions revealed by the inspection had deteriorated
following the child's removal, the primitive living conditions
described by the child in her credible testimony provide further
support for the finding of neglect (see Matter of Baby Girl E.,
306 AD2d 343, 343-344 [2003]; Matter of A. Children, 189 AD2d
872, 872 [1993]; Matter of Tammie Z., 105 AD2d 463, 464 [1984],
affd 66 NY2d 1 [1985]; Matter of Terry S., 55 AD2d 689, 690
[1976]).

Following dispositional and permanency hearings, Supreme
Court continued the child's placement in petitioner's custody and
— based in part upon the request of the child, who was then 16
years old — approved a change in her permanency goal from
reunification with respondent to "another planned permanent
living arrangement" (Family Ct Act § 1089 [c] [1] [v]), by which
the child will remain in petitioner's custody and continue to
reside with her foster family while completing high school and
preparing for college.[1]  The record evidence of respondent's

---

[1]  Petitioner and the attorney for the child contend that
respondent consented to the continued foster family placement,
and thus cannot challenge it (see e.g. Matter of Connor S.
[Joseph S.], 122 AD3d 1096, 1097 [2014]).  However, this is not
evident from the terms of the order itself, nor from review of
the transcript of the dispositional hearing, which is incomplete;
the transcript of the permanency hearing reveals that respondent

ongoing mental health issues and failure to cooperate with petitioner or progress toward reunification, the child's stated preference to remain with the foster family, and the willingness of the foster family to serve as a resource for her provide a sound and substantial basis for the court's determination that this disposition was in the child's best interests (see Matter of Alexis AA. [John AA.], 97 AD3d 927, 930 [2012]; compare Matter of Jose T. [Halvorsen], 87 AD3d 1335, 1336-1337 [2011]).

Peters, P.J., Egan Jr. and Lynch, JJ., concur.


ORDERED that the order is affirmed, without costs.


ENTER:

Robert D. Mayberger
Clerk of the Court

---

objected to the change in the permanency goal.